Argued December 21, 1948; reversed March 29, 1949

NAMBA ET AL. *v.* McCOURT AND NEUNER

204 P. 2d 569

580·

*Verne Dusenbery* and *Allan Hart,* of Portland, argued the cause for appellants. With them on the

brief were Crum, Dusenbery & Martin and Pendergrass, Spackman & Bullivant, of Portland.

*Rex Kimmell,* Deputy Attorney General, and *Cecil H. Quesseth,* Assistant Attorney General, argued the cause for respondents. With them on the brief were George Neuner, Attorney General, and John B. McCourt, District Attorney for Multnomah County.

Before ROSSMAN, Chief Justice,* and LUSK,** BELT, BRAND and HAY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs from a declaratory decree of the Circuit Court which held that our Alien Land Law (§ 61-101 to and including § 61-112, O. C. L. A.) and Oregon Laws 1945, Chapter 436, which contains provisions ancillary to the Alien Land Law, are valid legislation. The purpose of the suit which resulted in the challenged declaratory decree was to secure a holding that both of those acts are unconstitutional.

The appellants present these assignments of error:

1. "The Court erred in declaring that Sections 61-101 to 61-111, O. C. L. A., are constitutional, valid and enforceable."

2. "The Court erred in declaring that Section 1 of Chapter 436, Oregon Laws 1945, is constitutional, valid and enforceable."

---

\* Chief Justice when this cause was argued.
\*\* Chief Justice when this opinion was rendered.

3. "The Court erred in declaring that the presumption established by Section 2 of Chapter 436, Oregon Laws 1945, is a proper presumption and is therefore constitutional and valid."

Two of the plaintiffs, Kenji Namba and Florence C. Donald, are American citizens. The third plaintiff is Etsuo Namba, an ineligible alien, who was born in Japan and who is the father of Kenji Namba. Mrs. Donald is the owner of some agricultural land which she wishes to lease to the two Nambas and which they desire to rent. The defendants are the Honorable John B. McCourt, District Attorney for Multnomah County, and the Honorable George Neuner, Attorney General of this State.

The complaint charges that Oregon Laws 1945, Chapter 436, and §§ 61-102 to 61-112, O. C. L. A., violate constitutional provisions which provide for due process of law, the equal protection of law, and grant the Federal Government control over aliens and immigration.

The facts are set forth in the pleadings and an Agreed Statement of Facts. From these sources the following appears: Kenji Namba was born in Multnomah County May 2, 1925, of parents who were born in Japan. He has resided constantly in Oregon except in the period of evacuation and in an additional period of March 16, 1944, to February 6, 1946, while he was a member of the United States Army. While serving in the armed forces he engaged in combat operations in Italy. His discharge from the army was honorable and following it he returned to Multnomah County. The plaintiff, Etsuo Namba, was lawfully admitted in the United States. He, his wife and their son Kenji, are law-abiding, respected people. The plaintiff, Flor-

ence Donald, is the owner of a farm in Multnomah County, 62 acres in extent, which is improved with a substantial dwelling house. It stands on the west half of the land. We take the following verbatim from the agreed facts:

"During the months of January and February 1947, negotiations were entered into between the Plaintiff Florence C. Donald, who is the owner of the real property described in the complaint, and Plaintiffs Kenji Namba and Etsuo Namba with a view to the leasing of said farm. As a result of the negotiations an agreement was reached on the terms of two proposed leases. It was agreed that a five year lease should be given to Kenji Namba for the west half of the farm including the dwelling house located thereon, and that a five year lease should be given to Etsuo Namba for the east half of the farm, and that each of said lessees should farm and cultivate the property covered by his lease. The leases were to be in conventional form and contain substantially the same provisions with respect to the methods of cultivation that were contained in the last lease covering the farm, and the agreed amounts of the rentals accruing under the leases were to be paid in monthly installments. It was understood and agreed by the parties and was to be provided for in the two proposed leases, that the Plaintiffs Kenji Namba and Etsuo Namba and their respective wives would live in the dwelling house on the west half of farm, and that the Plaintiff Etsuo Namba who is an experienced farmer, would during at least the first two years of the terms of the leases, in addition to farming and cultivating the east half of the farm, advise and assist his son Kenji Namba in farming and cultivating the west half of the farm. It was also agreed and understood by the parties that while the two proposed leases were to be separate and distinct contracts, neither of said leases would be executed unless the other lease was also executed.

"The Plaintiffs Florence C. Donald, Kenji Namba and Etsuo Namba all desired to enter into the lease arrangements described above and would proceed to execute the said leases but for the fear of criminal prosecution and the risk of forfeiture by escheat proceedings. Kenji Namba is not a registered voter in Multnomah County."

After the parties had agreed upon all of the foregoing as the facts, the plaintiffs moved for the entry of a decree in their favor. The motion was denied and thereupon the challenged decree was entered.

We shall now give a resume of § 61-101 to and including § 61-112, O. C. L. A. Section 61-101 permits "all aliens eligible to citizenship" to acquire, own, convey and inherit real property in the same manner and to the same extent as citizens. Section 61-102 says:

"All aliens other than those mentioned in section 61-101 may acquire, possess, enjoy and transfer real property, or any interest therein, in this state, in the manner and to the extent and for the purpose prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise."

■ We pause to point out that although § 61-101 permits eligible aliens to acquire, inherit, possess and convey real property to the same extent as citizens, § 61-102 withholds those privileges from ineligible aliens unless the nation or country of which they are citizens has effected a treaty with our government whereby such privileges are available. Japanese aliens are not eligible to citizenship: 8 U. S. C. A., § 703 (see 1948 pocket part). From the fact just mentioned, it is seen that § 61-102, and not § 61-101, determines the right of a Japanese alien to acquire an interest in land

in this state. In 1911 Japan and the United States effected a treaty (see 37 Stat. 1504), the material part of which follows:

"The citizens or subjects of each of the contracting parties shall have liberty to enter, travel and reside in the territories of the other, to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established."

The parties are agreed that the provision just quoted does not confer upon Japanese aliens a right to own or lease agricultural land. *Yoshida v. Security Insurance Co.*, 145 Or. 325, 26 P. 2d 1082, intimated the same view. The foregoing shows that a Japanese alien, unlike an alien from, say, China, India or Russia, is barred by § 61-102 from owning or leasing Oregon agricultural land. July 26, 1939, the treaty with Japan was terminated. It is unnecessary for us to decide whether or not the termination destroyed or lessened the rights granted to ineligible aliens by § 61-102. We shall assume that it did not; the assumption is warranted by *Palermo v. Stockton Theatres*, 32 Cal. 2d 53, 195 P. 2d 1. We shall now continue our review of the Alien Land Law.

Sections 61-103, 61-104, 61-105, 61-106 and 61-107 pertain to corporations, guardians, trustees, nonresidents and probate proceedings. Since no legal unit of that kind is involved in this proceeding, we shall not pause upon those sections.

Section 61-108 renders it unlawful for anyone to

convey real property to an ineligible alien. Continuing, the section says:

> "Any real property acquired in violation of the provisions of this act shall escheat to, and become, and remain the property of the state of Oregon."

the rights granted to ineligible aliens by § 61-102. We shall assume that it did not; the assumption is warranted by *Palerno v. Stockton Theatres,* 32 Cal. 2d and leasehold estates.

Section 61-110 says:

> "Every transfer of real property, or of an interest therein, * * * shall be void as to the state * * * if the property interest involved is of such a character that an alien mentioned in section 61-102 hereof is inhibited from acquiring, * * * it * * *. A prima facie presumption that the conveyance is made with such intent shall arise upon proof of any of the following groups of facts: * * *."

Section 61-111 prescribes a penalty of imprisonment not exceeding two years and a fine of not exceeding five thousand dollars or both.

We come now to the 1945 enactment. Section 1 of it provides:

> "Whenever leases are made in the name of the wife or child of any alien not eligible to citizenship * * * and when such alien not eligible to such citizenship is then or thereafter allowed to remain or go upon the land, farm and cultivate same * * *, then any person signing or entering into any such agreement with knowledge that any such alien shall be allowed or permitted to farm and cultivate such land * * * shall be guilty of violation of the terms and provisions of this act and upon conviction thereof, shall be punished by imprisonment * * * not exceeding two years, or by a fine not exceed-

ing five thousand dollars ($5,000), or by both such fine and imprisonment, * * *.''

Sections 2, 3 and 4 of the act each create presumptions available to the state in the enforcement of the act. Section 5 declares that if any part of the act is deemed unconstitutional the remaining parts shall survive. Section 6 invoked an emergency with the result that the act became effective at once.

The 1945 act which we just reviewed was repealed in the current session of the legislative assembly by Senate Bill 13, which will not, however, become effective until 90 days after the adjournment of the present legislature; see Constitution of Oregon, Art. IV, sec. 28.

Since the enactment of our Alien Land Law this court has not been required to construe either it or the 1945 ancillary measure. The mention in *Yoshida v. Security Insurance Co.*, supra, of the Alien Land Law was incidental.

Before proceeding further, we shall take notice of those to whom § 61-102, O. C. L. A., is applicable. The Nationality Act of 1940 (adopted October 14, 1940, see 8 U. S. C. A., § 703) said:

"The right to become a naturalized citizen under the provisions of this chapter shall extend only to white persons, persons of African nativity or descent, and descendants of races indigenous to the Western Hemisphere."

An amendment adopted in 1943 (57 Stat. 601) rendered Chinese eligible to citizenship. The act was again amended in 1946 and at present has the form found in the pocket supplement of 8 U. S. C. A. 703, whereby it says:

"(a) The right to become a naturalized citizen

under the provisions of this chapter shall extend only to

"(1) white persons, persons of African nativity or descent, and persons who are descendents of races indigenous to the continents of North or South America or adjacent islands and Filipino persons or persons of Filipino descent;

"(2) persons who possess, either singly or in combination, a preponderance of blood of one or more of the classes specified in clause (1);

"(3) Chinese persons and persons of Chinese descent, and persons of races indigenous to India; and

"(4) persons who possess, either singly or in combination, a preponderance of blood of one or more of the classes specified in clause (3) or, either singly or in combination, as much as one-half blood of those classes and some additional blood of one of the classes specified in clause (1).

"(b) Nothing in the preceding * * *."

We now quote the following unchallenged statement which is contained in the appellants' brief:

"Arabs apparently have become ineligible by administrative and judicial interpretation, cf. In re Ahmed Hassan, 48 F. Supp. 843 (D. C. Mich. 1943), with ex parte Mohriez, 54 F. Supp. 941 (D. C. Mass. 1944). While it is true that groups like the Afghans, In re Feroz Din, 27 Fed. 2 568 (D. C. Cal. 1928), the Burmese, Matter of San C. Po, 7 Misc. 471, 28 N. Y. Supp. 383 (1894), and the Polynesians, In re Kanaka Nian, 6 Utah 259, 21 Pac. 993 (1889) 4 L. R. A. 726, are apparently still ineligible, none of these groups are present in the United States in significant numbers."

As we proceed we will be warranted in the belief that Japanese aliens are today the only group in Oregon of any significant size to which the Alien Land Law is applicable. Possibly there are no other persons to

whom it is applicable. With the enactment in 1924 of the Exclusion Act (8 U. S. C. A., § 213(c)), immigration from Japan ended. Accordingly, all Japanese nationals who are now in Oregon are at least twenty-five years of age, and, manifestly, many of them are in middle life or beyond. It is with them that our Alien Land Law deals. According to the 1940 census, there were then 1,617 Japanese aliens in Oregon. Very likely death, the effects of evacuation and other causes have reduced that number materially.

As we have said, the appellants, in their attack upon the two statutes before us, depend largely upon the Fourteenth Amendment and its guarantee of due process and of equal protection. As a starting point, we take the following good epitomization from 28 B. U. Law Rev. 237, 239:

> "The Fourteenth Amendment guarantees to any person within the jurisdiction of a state the equal protection of the laws. In 1885 in the case of Yick Wo v. Hopkins, Sheriff (118 U. S. 356, 30 L. Ed. 220, 6 S. Ct. 1064) the Supreme Court declared that the guarantees of that amendment extended to all persons within the territorial jurisdiction of the United States, without regard to differences of race, color or nationality. In that case a municipal ordinance of San Francisco prohibited the operation of a laundry without first obtaining the consent of the city board of supervisors. As admittedly applied, the ordinance discriminated against persons of Chinese nationality solely because of hostility towards that race. It was held that such discrimination is not legally justifiable. Again in Truax v. Raich (239 U. S. 33, 60 L. Ed. 131, 36 S. Ct. 7, L. R. A. 1916D 545, Ann. Cas. 1917B 283) and Hines v. Davidowitz (312 U. S. 52, 85 L. Ed. 581, 61 S. Ct. 399) the Supreme Court declared that unreasonable discrimination against any per-

son by reason of nationality is unconstitutional as violating the equal protection clause of the Fourteenth Amendment."

The validity of alien land laws enacted in two of our neighboring states was sustained by the Federal Supreme Court in 1923. *Terrace v. Thompson,* 263 U. S. 197, 68 L. Ed. 255, 44 S. Ct. 15, upheld the validity of a Washington act which was applicable to aliens who were nondeclarants or ineligibles. *Porterfield v. Webb,* 263 U. S. 225, 68 L. Ed. 278, 44 S. Ct. 21, sustained the validity of a California statute which, like ours, was applicable only to ineligible aliens. *Webb v. O'Brien,* 263 U. S. 313, 68 L. Ed. 318, 44 S. Ct. 112, upheld the validity of a provision of a California law which forbade share-cropping agreements with ineligible aliens. *Frick v. Webb,* 263 U. S. 326, 68 L. Ed. 323, 44 S. Ct. 115, held constitutional a provision of a California law which forbade sales of shares in agricultural corporations to ineligible aliens. All of those decisions were written by Mr. Justice Butler. In 1925 the same jurist wrote for his court *Cockrill v. California,* 268 U. S. 258, 69 L. Ed. 944, 45 S. Ct. 490, which held that the Fourteenth Amendment was not violated by a California statute which authorized in prosecutions for conspiring to violate the Alien Land Law a presumption that the conveyance was made for the purpose of avoiding the act whenever it appeared that (1) the consideration was paid by an ineligible alien, and (2) the grantee was a citizen. The Terrace decision was the first of the foregoing group. The others cited and relied upon it.

Since *Terrace v. Thompson,* supra, was the first of the group of decisions just cited, and since the others depended upon it as support for their holdings,

we shall now review it. The Terraces, who were citizens, owned agricultural land in the State of Washington. One Nakatsuka, an alien Japanese, was a capable farmer. He and the Terraces wished to enter into a five-year lease. The attack upon the Washington statute was the same as the one which is advanced against ours. At the very outset the court declared:

> "The Terraces' property rights in the land include the right to use, lease and dispose of it for lawful purposes (Buchanan v. Warley, 245 U. S. 60, 74), and the Constitution protects these essential attributes of property (Holden v. Hardy, 169 U. S. 366, 391), and also protects Kakatsuka in his right to earn a livelihood by following the ordinary occupations of life. Truax v. Raich, supra; Meyer v. Nebraska, 262 U. S. 390. If, as claimed, the state act is repugnant to the due process and equal protection clauses of the Fourteenth Amendment, then its enforcement will deprive the owners of their right to lease their land to Kakatsuka, and deprive him of his right to pursue the occupation of farmer, * * * "

■■ Thus, it is clear that Mrs. Donald has a constitutional right to use, lease and dispose of her farm land for all lawful purposes, and that Etsuo Namba, as well as his citizen son, Kenji, has a right to earn a livelihood by following any ordinary occupation. The court, in holding that the Washington act was not repugnant to the due process clause, said:

> "And, while Congress has exclusive jurisdiction over immigration, naturalization and the disposal of the public domain, each State, in the absence of any treaty provision to the contrary, has power to deny to aliens the right to own land within its borders. * * *
>
> "State legislation applying alike and equally to all aliens, withholding from them the right to own

land, cannot be said to be capricious or to amount to an arbitrary deprivation of liberty or property, or to transgress the due process clause.''

The court held that the act did not contravene the equal protection clause. In so doing, it said:

"Classification is the most inveterate of our reasoning processes. * * * The rights, privileges and duties of aliens differ widely from those of citizens; and those of alien declarants differ substantially from those of nondeclarants.''

After it had made those observations it took note of the naturalization laws which render some aliens eligible and others ineligible to American citizenship. It pointed out:

"Congress is not trammeled, and it may grant or withhold the privilege of naturalization upon any grounds or without any reason, as it sees fit.''

It reasoned:

"The rule established by Congress on this subject, in and of itself, furnishes a reasonable basis for classification in a state law withholding from aliens the privilege of land ownership as defined in the act. We agree with the court below (274 Fed. 841, 849) that 'it is obvious that one who is not a citizen and can not become one lacks an interest in, and the power to effectually work for the welfare of, the State, and, so lacking, the State may rightfully deny him the right to own and lease real estate within its boundaries. If one incapable of citizenship may lease or own real estate, it is within the realm of possibility that every foot of land within the State might pass to the ownership or possession of noncitizens.''

It next took notice of the holding in *Truax v. Raich,* supra, that "the right to work for a living in the common occupations of the community is a part of

the freedom which it was the purpose of. the Fourteenth Amendment to secure," but held:

"In the case before us, the thing forbidden is very different. It is not an opportunity to earn a living in common occupations of the community, but it is the privilege of owning or controlling agricultural land within the State. The quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the State itself."

The court concluded:

"The State act is not repugnant to the equal protection clause and does not contravene the Fourteenth Amendment."

The other four decisions added nothing material to what was said in the opinion just reviewed, and we shall, therefore, refrain from going over them.

The five decisions just cited, which sustained the validity of alien land laws under attacks that stemmed from the due process and equal protection clauses of the Fourteenth Amendment, control us in our determination of this case, unless we are convinced from developments that took place after the announcement of those decisions that the Supreme Court no longer deems the decisions binding.

We shall now take note of developments that occurred after those decisions were written.

*Oyama v. California*, 332 U. S. 633, 92 L. Ed. 257, 68 S. Ct. 269, which was announced in 1948, held that a California statute violated the due process and equal protection clauses which created out of the following facts a presumption of a purpose to avoid escheat: (1) a conveyance of. farm land to a citizen, and (2) payment of the consideration by an ineligible alien.

The case involved two conveyances of California land. In each instance, an ineligible alien, Kajiro Oyama, furnished the consideration, and in each instance his son, Fred Oyama, born in the United States, was grantee. The first transaction occurred when Fred was six years of age, the second three years later. Six months after the first the father was appointed guardian of his son's estate. Although the father was made guardian, he failed to file reports which a California statute exacted of all guardians of agricultural land belonging to minor children of ineligible aliens. The California courts drew inferences from his omissions which were adverse to the son's interests. Five years after the second conveyance, the Oyama family was evacuated from the Pacific Coast along with others of Japanese descent. Two years later the State filed escheat proceedings based upon contentions that the conveyances to Fred were made with intent to evade the Alien Land Law. Five opinions were written in the case. The Chief Justice wrote the majority decision. It held that the California presumption statute denied to Fred, the American citizen, the equal protection of the law. The Chief Justice's opinion did not consider other attacks upon the validity of the act which stemmed, for instance, from the alien father's rights, nor did it consider the validity of the California Alien Land Law. The Chief Justice wrote:

"The cumulative effect, we believe, was clearly to discriminate against Fred Oyama. He was saddled with an onerous burden of proof which need not be borne by California children generally. The statutory presumption and the two ancillary inferences, which would not be used against most children, were given such probative value as to prevail in the face of a deed entered in the public records, * * *. In short, Fred Oyama lost his

gift, irretrievably and without compensation, solely because of the extraordinary obstacles which the State set before him.

"The only basis for this discrimination against an American citizen, moreover, was the fact that his father was Japanese and not American, Russian, Chinese, or English. But for that fact alone, Fred Oyama, now a little over a year from majority, would be the undisputed owner of the eight acres in question. * * *

"There remains the question of whether discrimination between citizens on the basis of their racial descent, as revealed in this case, is justifiable. Here we start with the proposition that only the most exceptional circumstances can excuse discrimination on that basis in the face of the equal protection clause and a federal statute giving all citizens the right to own land. * * *

"The only justification urged upon us by the State is that the discrimination is necessary to prevent evasion of the Alien Land Law's prohibition against the ownership of agricultural land by ineligible aliens. This reasoning presupposes the validity of that prohibition, a premise which we deem it unnecessary and therefore inappropriate to reexamine in this case. But assuming, for purposes of argument only, that the basic prohibition is constitutional, it does not follow that there is no constitutional limit to the means which may be used to enforce it. * * *

"Since the view we take of petitioners' first contention requires reversal of the decision below, we do not reach their other contentions: that the Alien Land Law denies ineligible aliens the equal protection of the laws, and * * *."

Mr. Justice Black, in a specially concurring opinion in which Mr. Justice Douglas joined, said:

"I concur in the Court's judgment and its opinion. But I should prefer to reverse the judg-

ment on the broader grounds that the basic provisions of the California Alien Land Law violate the equal protection clause of the Fourteenth Amendment and conflict with federal laws and treaties governing the immigration of aliens and their rights after arrival in this country. * * *

"* * * If there is any one purpose of the Fourteenth Amendment that is wholly outside the realm of doubt, it is that the Amendment was designed to bar States from denying to some groups, on account of their race or color, any rights, privileges, and opportunities accorded to other groups. I would now overrule the previous decisions of this Court that sustained state land laws which discriminate against people of Japanese origin residing in this country."

Mr. Justice Murphy wrote a specially concurring opinion in which Mr. Justice Rutledge concurred. He said:

"To me the controlling issue in this case is whether the California Alien Land Law on its face is consistent with the Constitution of the United States. Can a state prohibit all aliens ineligible for American citizenship from acquiring * * * agricultural land? Does such a prohibition square with the language of the Fourteenth Amendment * * * ?

"The negative answer to those queries is dictated by the uncompromising opposition of the Constitution to racism, whatever cloak or disguise it may assume. The California statute in question, as I view it, is nothing more than an outright racial discrimination. As such it deserves constitutional condemnation."

At that point Justice Murphy gave a narrative of California's anti-Japanese feeling and of its Alien Land Laws. That part of the opinion concluded with:

"The Alien Land Law, in short, was designed to effectuate a purely racial discrimination, to pro-

hibit a Japanese alien from owning or using agricultural land solely because he is a Japanese alien. It is rooted deeply in racial, economic and social antagonisms."

In determining whether or not the act, "viewed against the background of racism, can mount the hurdle of the equal protection clause of the Fourteenth Amendment", Justice Murphy considered the argument that "the rule established by Congress for determining those classes of aliens who may become citizens furnished in and of itself a reasonable basis for the discrimination involved in the Alien Land Law." In rejecting that contention, he pointed out that Congress' power over immigration is plenary. He held:

"What may be reasonable and constitutional for Congress for one purpose may not be reasonable or constitutional for a state legislature for another and wholly distinct purpose."

Next, he declared that it is not true that only those who are eligible for citizenship display allegiance and work for the welfare of the state. He resorted to illustrations, and concluded with:

"As this Court has said, 'Loyalty is a matter of the heart and mind, not of race, creed or color.' Ex parte Endo, 323 U. S. 283, 302. And so racial eligibility for citizenship is an irrational basis for determining who is loyal or who desires to work for the welfare of the state."

We shall consider one more of the subdivisions of his opinion. He began it thus:

"It has been said that if ineligible aliens could lease or own farms, it is within the realm of possibility that they might acquire every foot of land in California which is fit for agriculture."

In repudiating the assertion, he reviewed statistics showing the number of Japanese in California in 1910 and in later years, and the number of acres owned by them. His figures indicate that in recent years the number has become small and older. He concluded:

> "The existence of a few thousand aging residents, possessing no racial characteristic dangerous to the legitimate interests of California, can hardly justify a racial discrimination of the type here involved."

We shall quote one more observation from his opinion:

> "Moreover, this nation has recently pledged itself, through the United Nations Charter, to promote respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language and religion. The Alien Land Law stands as a barrier to the fulfillment of that national pledge. Its inconsistency with the Charter, which has been duly ratified and adopted by the United States, is but one more reason why the statute must be condemned."

Mr. Justice Reed wrote a dissenting opinion which met with the concurrence of Mr. Justice Burton. It said:

> "The Court's opinion assumes *arguendo* that the California Alien Land Laws are constitutional."

It criticised the opinions which we have just reviewed and expressed the belief that the presumption statute was equally applicable to all grantees whether citizens or not. In another dissenting opinion, Mr. Justice Jackson said:

> "I am unable to see how this Court logically can set aside this judgment unless it is prepared to invalidate the California Alien Land Laws, * * *."

He believed that the presumption statute treated the son of an ineligible alien no differently than the son of anyone else who took a conveyance in which the purchase money was paid by an ineligible alien.

It is seen from the foregoing resume that although four members of the Court favored a holding that the basic Alien Land Law was violative of the Fourteenth Amendment, none of the other five expressed a belief in the constitutionality of that statute. The majority opinion concerned itself with the ancillary presumption statute and went no further with the basic statute than to assume its validity. We observe that 36 Calif. Law Rev. 320, 324, referring to the Oyama decision, says:

> "The Attorney General of California has interpreted it as ending the practical utility of the alien land law, and has indicated his intention to dismiss all the escheat cases pending before the California courts."

Thus it may be that the decision, in fact, ended the Alien Land Law.

About six months after the Oyama decision was announced *Takahashi v. Fish and Game Commission,* 334 U. S. 410, 92 L. Ed. 1096, 68 S. Ct. 1138, was decided; it held that a California statute that forbade the issuance of commercial fishing licenses to ineligible aliens was repugnant to the equal protection clause of the Fourteenth Amendment. Prior to his evacuation during the war period, Takahashi had been a commercial fisherman who caught fish in the ocean waters off the California coast. In 1943, that is, during the evacuation period, a statute was enacted which prohibited the issuance of a commercial fishing license to any "alien Japanese." The next session changed

the quoted phrase to "person ineligible to citizenship." After his return to California in 1945 Takahashi, who met all other requirements, was denied a license and thereupon petitioned for mandamus. The decision, written by Mr. Justice Black, began its consideration of the validity of the act by taking notice of the following contained in *Truax v. Raich,* supra:

"It must also be said that reasonable classification implies action consistent with the legitimate interests of the State, and it will not be disputed that these cannot be so broadly conceived as to bring them into hostility to exclusive Federal power. The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government. Fong Yue Ting v. United States, 149 U. S. 698, 713. The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the States as chose to offer hospitality."

The decision pointed out:

"California now urges, and the State Supreme Court held, that the California fishing provision here challenged falls within the rationale of the 'special public interest' cases distinguished in the Truax opinion, and thus that the state's ban upon commercial fishing by aliens ineligible to citizenship is valid. The contention is this: California owns the fish within three miles of its coast as a trustee for all California citizens as distinguished from its non-citizen inhabitants; * * *."

Going on, the Court said:

"It does not follow, as California seems to argue, that because the United States regulates immigration and naturalization in part on the basis of race and color classifications, a state can adopt one or more of the same classifications to prevent lawfully admitted aliens within its borders from earning a living in the same way that other state inhabitants earn their living. The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. See Hines v. Davidowitz, 312 U. S. 52, 66. Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states. State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionality derived federal power to regulate immigration, and have accordingly been held invalid. Moreover, Congress in the enactment of a comprehensive legislative plan for the nationwide control and regulation of immigration and naturalization, has broadly provided:

"'All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, * * *.'"

The decision continued:

"The protection of this section has been held to extend to aliens as well as to citizens. Consequently the section and the Fourteenth Amendment

on which it rests in part protect 'all persons' against state legislation bearing unequally upon them either because of alienage or color. See Hurd v. Hodge, 334 U. S. 24, 92 L. Ed. 857, 68 S. Ct. 847. The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws.''

Having made those observations, the Court returned to California's claim that it was the owner of all fish . within the three-mile belt. It left undisturbed such decisions as Patsone v. Pennsylvania, 232 U. S. 138, 58 L. Ed. 539, 34 S. Ct. 281, which held that a state may lawfully conserve its game for its own citizens, but found that the facts brought the case within *Missouri v. Holland*, 252 U. S. 416, 64 L. Ed. 641, 40 S. Ct. 382, in which the Court sustained the validity of the Federal Migratory Bird Treaty Act. That decision rejected a claim by Missouri of ownership of birds within its boundary. Finally, the Court said:

''This leaves for consideration the argument that the law should be upheld on authority of those cases which have sustained state laws barring aliens ineligible to citizenship from land ownership. Assuming the continued validity of those cases, we think they could not in any event be controlling here. They rested solely upon the power of states to control the devolution and ownership of land within their borders, a power long exercised and supported on reasons peculiar to real property. They cannot be extended to cover this case.''

Mr. Justice Murphy wrote a specially concurring opinion in which Mr. Justice Rutledge joined; it reasoned that the act before the Court was the outgrowth of anti-Japanese feeling, and maintained that no legis-

lation based upon racial antagonism is valid. Mr. Justice Reed wrote a dissenting opinion which won the approval of Mr. Justice Jackson, in which they held that the act could be sustained on the grounds that (1) a state can exclude all aliens from its fisheries, and (2) a discrimination between eligible and ineligible aliens can be deemed reasonable.

■ The foregoing completes our review of the controlling decisions. A quarter of a century has passed since the decisions in *Terrace v. Thompson,* supra, and its companion cases were announced. In that score and five years significant changes took place in our understanding of constitutional law, in our governmental structure, in our relationship with other nations and their people, in the number of ineligible aliens within our borders, and in the attitude of the American citizen toward others who do not have his individual color, creed, or racial background. Possibly we can make clearer what we have in mind by resorting to the following summary: (1) Congress' successive amendments of the Naturalization Act whereby Chinese and other national groups, which were previously barred from citizenship are now eligible thereto, have left the Japanese as virtually the only people to whom the Oregon Alien Land Law is applicable. (2) The number of ineligible aliens along the Pacific Coast is materially smaller today than it was in so recent a period as the beginning of the war. (3) The enactment of the Exclusion Act, which occurred after the Alien Land Laws were adopted in the three Pacific Coast states, stopped immigration from Japan. (4) Recent developments in constitutional law, which seek to realize the goal for which the equality clause aims, emphasize with increasing stress that no classification can be countenanced

unless (a) it is based upon real and substantial differences which are relevant to the purpose which the act seeks to achieve, and (b) the purpose itself is a permissible one. (5) Classifications employed in the Naturalization Act cannot be blindly used by the states in their legislation. (6) The American people have an increasing consciousness that, since we are a heterogeneous people, we must not discriminate against anyone on account of his race, color or creed. (7) The implications that arise from the concept of One World bring home the realization that the rights and privileges of aliens within our borders are matters for the Federal Government, and not for the states. (8) Every alien lawfully within our borders, even though he is a nondeclarant or an ineligible, must be afforded free access to the ordinary occupations in whatever community he abides. (9) When our nation signed the Charter of the United Nations we thereby became bound to the following principles (Article 55c, and see Article 56):

> "Universal respect for, and observance, of human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion."

We do not believe that the present membership of the Federal Supreme Court discarded the principles of constitutional law which Mr. Justice Butler employed in his five opinions, but think that it assigned greater value to some rules and circumstances than he did. For instance, it assigned greater value than he to (1) the right of all aliens within our borders, wherever they may be, to engage in ordinary occupations, (2) the freedom of all rights from impairment by legislation which is based upon the individual's

color, race or creed, and (3) the desirability in general of having the Federal government alone enact special laws concerning the status of aliens, if any need to be enacted. It assigned less value than he to the classifications made by our Naturalization Act. At least two members of the Court found that his fears that aliens might come into the ownership of all agricultural land lying in the Coast states were unwarranted.

We come now directly to the problem as to whether or not *Oyama v. California,* supra, and *Takahashi v. Fish and Game Commission,* supra, show that a majority of the Court no longer believes that a state can lawfully deny to an alien the right of renting or buying real property which lies within the state. *Terrace v. Thompson,* supra, was concerned with alien land laws; *Takahashi v. Fish and Game Commission,* supra, was concerned with a license statute; and the subject matter of the opinion in *Oyama v. California,* supra, was a procedural device which a statute undertook to render available in alien land law cases. The Terrace opinion was, therefore, the only one of the three which dealt with the specific problem before us.

It will be recalled that the majority opinion in *Takahashi v. Fish and Game Commission,* supra, said that the validity of alien land laws "rested solely upon the power of states to control the devolution and ownership of land within their borders." Possibly it may be pertinent to take note of the fact that the power mentioned by the quoted language is "the power of states." It will also be recalled that *Terrace v. Thompson,* supra, said: "Each state, in the absence of any treaty provision to the contrary, has power to deny to aliens the right to own land within its borders." Here, again, the power that is spoken of is the power reposed

in the state. Accordingly, it is clear that the power which a state exercises when it permits aliens to acquire land within its confines is its own power. The only issue, then, that remains is whether the state's power is plenary in nature or whether its exercise is subject to the restraints imposed by the Fourteenth Amendment.

*Terrace v. Thompson,* supra, in support of its statement that "each state, in the absence of any treaty provision to the contrary, has power to deny to aliens the right to own land within its borders" cited *Hauenstein v. Lynham,* 100 U. S. 483, 484, 488; *Blythe v. Hinckley,* 180 U. S. 333, 340. Going on, it proceeded as follows:

"Mr. Justice Field, speaking for this Court (Phillips v. Moore, 100 U. S. 208) said (p. 212):

'By the common law, an alien cannot acquire real property by operation of law, but may take it by act of the grantor, and hold it until office found; that is, until the fact of alienage is authoritatively established by a public officer, upon an inquest held at the instance of the government.'

"State legislation applying alike and equally to all aliens, withholding from them the right to own land, cannot be said to be capricious or to amount to an arbitrary deprivation of liberty or property, or to transgress the due process clause."

With the greatest respect for the learning of the Court which wrote those lines, we do not believe that the cited decisions hold that legislation of any state can deny to aliens the right to own land within the state's borders. We think that they go no further than to indicate that state legislation can alter the provisions of the common law concerning an alien's ownership of land. It will be noticed from the quoted passages

that at common law an alien could acquire property by the act of the grantor. That circumstance is material in a consideration of the validity of the transaction which the appellants wish to consummate. The quoted passages say that although at common law an alien could take title through the act of his grantor, the state could take it from him through the medium of office found. The explanation of the latter is thus given to us by Chief Justice Redfield in *State v. Boston, Concord & Montreal R. R. Co.,* 25 Vt. 433:

> "The escheat of estates to the sovereign in consequence of a conveyance to an alien, is a result of purely feudal character. It was so held, because an alien, owing a foreign allegiance, was regarded as incapable of performing feudal military services to the King, as lord paramount of all the land in the realm."

It is difficult to understand how the common-law rule, whereby an alien could be deprived of his land by office found, survived the Fourteenth Amendment—if, in fact, it survived.

The problem which awaits our solution is not whether Oregon could enact a valid act which would prohibit all aliens from acquiring Oregon land. Our state has never attempted to adopt an act of that kind. Our problem is this: Is the statute before us, which prohibits some aliens from acquiring land while authorizing all others to do so, valid?

Oregon, ever since statehood, has authorized some aliens to acquire Oregon land. For instance, Article I, section 31, Constitution of Oregon, says:

> "White foreigners who are or may hereafter become residents of this state shall enjoy the same rights in respect to the possession, enjoyment and

descent of property as native-born citizens. And the legislative assembly shall have power to restrain and regulate the immigration to this state of persons not qualified to become citizens of the United States.''

Clearly, the provision just quoted sought to restrict the ownership of Oregon land to white aliens eligible to citizenship. *Terrace v. Thompson,* supra, sustained ''state legislation applying alike and equally to all aliens.'' That standard condemns the one we quoted from our Constitution. Of course, the effort ''to restrain and regulate the immigration to this state of persons not qualified to become citizens of the United States'' is repugnant to the holding in *Truax v. Raich,* supra.

More than sixty years after the constitutional provision was adopted, the act before us was written. It represents Oregon's second effort to legislate upon the subject of alien land ownership.

As must be obvious, *Terrace v. Thompson,* supra, held that state legislation which regulates alien land ownership is subject to the equal protection and due process clauses of the Fourteenth Amendment. In fact, most of that decision deals with the application of the due process and equal protection clauses of the Fourteenth Amendment to state legislation regulating alien land ownership. The decision asked:

''Is the act repugnant to the due process clause or equal protection clause of the Fourteenth Amendment?''

and answered the query thus:

''Alien inhabitants of the State, as well as all other persons within its jurisdiction, may invoke the protection of these clauses.''

After making an analysis of the Washington act, it held:

> "State legislation applying alike and equally to all aliens * * * cannot be said to be capricious * * * or to transgress the due process clause. * * * The State act is not repugnant to the equal protection clause and does not contravene the Fourteenth Amendment."

*Webb v. O'Brien,* supra, which sustained the validity of a California statute which rendered illegal share cropper contracts made by ineligible aliens, found that the statute was a proper exercise of the state's police power. The same was true in *Frick v. Webb,* supra, which sustained as valid a statute which rendered unlawful the sale of stock in agricultural corporations to ineligible aliens. Those decisions did not indicate that statutes which concern land ownership are beyond the reach of the Fourteenth Amendment, but, to the contrary, held that in each instance the police power was exercised with due deference to the demands of the Amendment.

Nothing said in *Oyama v. California,* supra, or *Takahashi v. Fish and Game Commission,* supra, withdrew the pronouncements in *Terrace v. Thompson,* supra, and its companion cases that the due process and equal protection clauses of the Fourteenth Amendment govern state legislation which concerns alien land ownership. Neither of those two recent decisions questioned anything said in the Terrace opinion upon the subject just mentioned. To the contrary, the Chief Justice, speaking for the majority in the Oyama opinion, said:

> "We agree with petitioners' first contention, that the Alien Land Law, as applied in this case, deprives Fred Oyama of the equal protection of

California's laws and of his privileges as an American citizen.''

Before closing this subject, we wish to recall that *Terrace v. Thompson,* supra, in harmony with *Truax v. Raich,* supra, recognized that state legislation cannot interfere with the superior powers which the Federal Government possesses over immigration and aliens.

■ Although we believe that *Oyama v. California,* supra, and *Takahashi v. Fish and Game Commission,* supra, disapprove of the parts of *Terrace v. Thompson,* supra, (and its companion decisions) concerning classification, we do not believe that either of them disapproved the portions of those opinions which held that state legislation upon the subject of alien land acquisition must conform to (1) the due process clause, (2) the equal protection clause, and (3) the Federal Government's superior powers over aliens and immigration. Accordingly, we deem ourselves bound by those parts. In fact, it is clear to us that the reasoning in the Oyama and the Takahashi decisions strengthened and amplified the parts of the Terrace decision to which we just referred. In short, we deem it our duty (1) to disregard the parts of the Terrace decision which concern classification and to follow the holdings in the Oyama and Takahashi decisions upon that subject, and (2) to hold that state legislation concerning the acquisition of land by aliens is subject to the due process clause, the equal protection clause, and to the superior powers of the Federal Government over aliens and immigration (whenever those powers are pertinent).

We recognize that nothing was said in any of the decisions above mentioned that any state must permit aliens to acquire land within its borders. The truth

is that *Terrace v. Thompson,* supra, held to the contrary, and its holding still stands. However, the statute before us is not one which bars all aliens from land acquisition. It classifies aliens and permits only the favored ones to enjoy our agricultural land. Further, the section of the Oregon Constitution, which is quoted in a preceding paragraph, likewise favors some aliens with the privileges of the soil. We also recognize that the Federal Supreme Court, in language to which no later decision took exception, held that state legislation on land ownership which conforms to an existing treaty cannot be deemed unreasonable. But at the present time our nation has no treaty with Japan, and, accordingly, the classifications in the statute before us have no support from any treaty. It must stand, if it is capable of doing so, upon the merits of the classification which itself makes.

■ *Oyama v. California,* supra, *Takahashi v. Fish and Game Commission,* supra, as well as a score or more recent judicial pronouncements render it clear that no statute is valid which discriminates against anyone on account of his race, color or creed. "All men are created equal" in the contemplation of law so far as concerns their color, race and creed. Race, color and creed can gain for no one any rights in any of our three departments of government, and likewise no department can impair anyone's rights on account of his race, color or creed. The decisions make it clear that legislation which violates those simple precepts is repugnant to the due process and equal protection clauses of the Fourteenth Amendment. It is equally repugnant to Sections 1, 18 and 20 of Article I, Constitution of Oregon.

■ If our legislation upon the subject of alien land

ownership is to be sustained we must find within ineligible aliens some valid reason why they, as a class, should not be permitted to own and rent agricultural land. In fact, in order to sustain the validity of Oregon Laws 1945, Chapter 436, it is necessary to find within ineligible aliens an unfavorable quality of such magnitude that it demands that they be kept off our farms. The validity of this legislation is dependent upon the police power of the state, and that power protects the health, safety, morals and general welfare of the people. Legislation enacted under the police power must have one of the purposes just mentioned, and if, in seeking to achieve its goal, it resorts to classification, imposing upon some classes burdens withheld from the others, the classification must be based upon a real and substantial difference between the classes. Moreover, the difference between the classes must be relevant to the purpose which the act undertakes to achieve.

■ A class of persons may be singled out and special burdens may be placed upon it, provided the class manifests characteristics which to a real and substantial extent distinguish it from all other persons and justify the imposition of the burden. But color, as well as race and creed, is an unacceptable distinguishing characteristic. Likewise, if the purpose of this law is to render Oregon inhospitable to ineligible aliens, and thereby induce them to avoid us, *Truax v. Raich,* supra, demands that we reject that as a legitimate purpose for state legislation.

No suggestion has been made that ineligible aliens are incompetent farmers and that they should be barred from the soil as a means of conserving it. It has not been argued that they are wasteful of any

of our natural resources, nor has it been argued that the interests of the consumers demand that ineligible aliens should be kept off our agricultural land. Although the claim has not been advanced in this case, proponents of this kind of legislation not infrequently seek to support it with the argument employed by the Attorney General of California in *Frick v. Webb,* supra, (see Anti-Japanese Land Laws, 35 Cal. L. R. 7, 49):

> "It was the purpose of those who understood the situation to prohibit the enjoyment or possession of, or dominion over, the agricultural lands of the State by aliens ineligible to citizenship,— in a practical way to prevent ruinous competition by the Oriental farmer against the American farmer."

It is obvious that that argument must be rejected.

We have been employing the term of our statute, "ineligible aliens", although the Japanese aliens are virtually the only persons embraced within the term. All of our Japanese aliens are at least twenty-five years of age, and since most of them immigrated to America about 1910, most of them are in middle age or beyond it. No one claims that any danger to our general welfare lurks in this small group of people who long ago lost the bloom of youth. The Exclusion Act makes it certain that their dwindling number will not be increased.

The several hundred alien Japanese to whom the Alien Land Law is applicable came to our state lawfully under laws enacted by Congress. They are here lawfully and are entitled to remain. Many of them are parents of United States citizens, and some of them are mothers and fathers of American soldiers who gave a good account of themselves in the recent war.

Our country cannot afford to create, by legislation or judicial construction, a ghetto for our ineligible aliens. And yet if we deny to the alien who is lawfully here the normal means whereby he earns his livelihood, we thereby assign him to a lowered standard of living.

We know of no basis upon which these two acts can be sustained.

■ It is clear from *Oyama v. California,* supra, that Oregon Laws 1945, Chapter 436, infringes upon the equal protection clause of the Fourteenth Amendment. We hold that it is invalid.

We think that the analyses set forth in preceding paragraphs shows that our Alien Land Law (§ 61-101 to and including § 61-112, O. C. L. A.) must be deemed violative of the principles of law which protect from classifications based upon color, race and creed. Preceding paragraphs cited the pertinent constitutional provisions.

The cause is remanded to the Circuit Court to enter a decree favorable to the appellants, in conformity with the views herein expressed.

REVERSED.

HAY, J., did not participate in the decision in this case.