DEPARTMENT OF LABOR AND INDUSTRY OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. EVARISTO CRUZ, T/A CRUZ CONSTRUCTION COMPANY, DEFENDANT-APPELLANT.

Argued May 18, 1965—Decided July 8, 1965.

*Mr. William B. Kaufman* argued the cause for appellant (*Mr. David A. Weinstein,* on the brief; *Messrs. Kaufman & Kaufman,* attorneys).

*Mr. Morris Yamner,* Deputy Attorney General, argued the cause for respondent (*Mr. Donald L. Raff,* Deputy Attorney General, on the brief; *Mr. Arthur J. Sills,* Attorney General, attorney).

The opinion of the court was delivered by

FRANCIS, J.  On or about October 17 and 18, 1963 defendant Cruz, trading as Cruz Construction Company, was engaged in laying a trunk line for the Pompton Lakes municipal sewer system.  The work was a public project performed at public expense under a contract between Cruz and the Borough of Pompton Lakes, New Jersey.  On those dates Cruz

employed 14 Portuguese aliens as laborers on the project. Although they were not United States citizens, they were legally in this country and held alien registration cards. A complaint was filed in the Municipal Court by the Department of Labor and Industry charging violation of *R. S.* 34:9–1, which prohibits employment of aliens on public works. Cruz was found guilty on each of the 14 counts and fined $1,400 plus costs. The statute fixes a penalty of $100 for each violation. The County Court affirmed the conviction, and on our own motion we certified the ensuing appeal before it was argued in the Appellate Division.

On this appeal defendant claims the statute transgresses the equal protection clause of the Fourteenth Amendment of the Federal Constitution, and *Art.* 1, ¶ 5 of the New Jersey *Constitution of* 1947. He contends further that *R. S.* 34:9–1 was impliedly repealed by subsequent inconsistent legislation which we shall discuss hereafter. We find it unnecessary to deal with the constitutional problems because we are satisfied the contention of implied repealer is sound and requires a reversal of the convictions. But on the issue of constitutionality, compare *People v. Crane,* 214 *N. Y.* 154, 108 *N. E.* 427 *(Ct. App.* 1915), affirmed 239 *U. S.* 195, 36 *S. Ct.* 85, 60 *L. Ed.* 218 (1915), and *Heim v. McCall,* 239 *U. S.* 175, 36 *S. Ct.* 78, 60 *L. Ed.* 206 (1915), with *Takahashi v. Fish & Game Commission,* 334 *U. S.* 410, 419–420, 68 *S. Ct.* 1138, 92 *L. Ed.* 1478, 1487 (1948), and see "Constitutionality of Restrictions on Aliens' Right to Work," 57 *Colum. L. Rev.* 1012 (1957); Note, "1947–1948 Term of the Supreme Court: The Alien's Right to Work," 49 *Colum. L. Rev.* 257 (1949); "National Power to Control State Discrimination Against Foreign Goods and Persons: A Study in Federalism," 12 *Stan. L. Rev.* 355 (1960); *Agreement with Portugal on passport visa fees,* Feb. 24, 1950 [1950], 1 *U. S. T. & O. I. A.* 461, *T. I. A. S. No.* 2084.

The statute, *R. S.* 34:9–1, which provided the basis for defendant's prosecution was adopted in 1899. *L.* 1899, *c.* 202. So far as pertinent, it provides:

> "It shall be unlawful for the state or any county, municipality, board, committee, commission or officer thereof, officer, body or organization having charge of any public work * * *, whether the same be a building, excavation, pipe-laying, bridge or dock-building, sewer or drainage construction, road building, paving, or any other form or kind of public work, which shall be undertaken and done at public expense or for any person or corporation, to employ as a mechanic or laborer upon such public work or construction, or any part thereof, any person who is not at the time of such employment a citizen of the United States * * *."

Penalty for violation is fixed at $100.

It has been said that the evil at which statutes of this nature were aimed originally was the importation of foreign labor to work for wages amounting to peonage. See *Bureau of Statistics of Labor and Industries of New Jersey Seventh Ann. Rep.* (1884), c. iii, "Importation of Foreign Labor Under Contract," *pp.* 274–281; also, c. iv, "Immigration and the Labor Problem," *pp.* 284–296. Such immigration practice was not only considered detrimental to the dignity and freedom of aliens as human beings, but the competitive force it produced was deemed inimical to the welfare of the laboring class of citizens of this country.

Since enactment the statute has remained on the books in its original form. We have been unable to find any reported cases where it has been considered, applied or attacked. In 1931, however, its harshness was ameliorated but without any specific reference to the statute. *L.* 1931, *c.* 27 and *c.* 402 provided that in the performance of any form or kind of public work preference in employment "shall be given to citizens of the State of New Jersey [who have resided and been domiciled therein continuously for a period of one year]." The bracketed portion was added by *c.* 402. But both chapters authorized employment of persons "other than citizens of the State of New Jersey * * * when such citizens are not available." *L.* 1934, *c.* 92 added the requirement that the one year domicile in New Jersey be immediately prior to such employment. The statute as amended in 1934 is still in force, appearing as *R. S.* 34:9–2.

Thus it may be said on the basis of the legislative mosaic, that at the end of 1934 it was no longer unlawful to employ an alien on a public work or construction project if citizens of the State were not available.

The suggestion has been made that the purpose of the 1931 and 1934 acts was to give preference in such employment to citizens of New Jersey, and thereafter to permit employment of citizens of other states, but not to alter the 1899 prohibition (*R. S.* 34:9–1, *supra*) against employment of aliens. We consider that to be an unduly restrictive analysis. Obviously if the lawmakers' intent was simply to secure a preference for New Jersey citizens over citizens of sister states, it would have been a simple matter to say so. Instead, upon creating the preference for our citizens, it provided that "persons" other than citizens of New Jersey may be employed when such citizens are not available. "Persons" is a word of broad connotation; in context it may include citizens and aliens. Restriction on the right of a person lawfully in this country to earn a living ought to be soberly regarded and construed strictly rather than expansively. See *Takahashi v. Fish & Game Commission, supra* (334 *U. S.*, at *pp.* 419–420, 68 *S. Ct.*, at *pp.* 1142–1143, 92 *L. Ed.*, at *p.* 1487).

In 1933 another act, *L.* 1933, *c.* 277, now, as amended, *N. J. S. A.* 10:2–1, was adopted which broadly covered the subject of discrimination in public employment. It required every contract between the State, county, city, township or other municipality and a contractor for the construction, alteration or repair of any public building or public work to contain provisions by which the contractor agrees that in the hiring of laborers, workmen or mechanics neither he nor any subcontractor will discriminate by reason of "race, creed or color" against *"any citizen* of the State of New Jersey who is qualified and available to perform the work to which the employment relates; * * *" *L.* 1933, *c.* 277, § 1(a). (Emphasis added)

Paragraphs 1(c) and (d) required further stipulations that a penalty of $5 a day shall be deducted from the amount pay-

able under the contract for each calendar day for each person discriminated against; that in case of such discrimination the contract may be cancelled or terminated by the public body involved; and all money due or to become due may be forfeited for "a second or any subsequent violation" of the provisions against discrimination.

The 1933 act was amended by *L.* 1945, *c.* 171 by the addition to paragraph 1(a) of a requirement for further stipulation in the contract for public work that the ban on discrimination in employment against New Jersey citizens would include "national origin or ancestry" as well as race, creed or color. *N. J. S. A.* 10:2–1.

As a matter of statutory evolution it should be noted that the amendment was approved and became effective on April 16, 1945. On the same day a new and related statute was approved and became effective. This new statute was designated "Law Against Discrimination." *L.* 1945, *c.* 169, now, as amended, *N. J. S. A.* 18:25–1 to 28. In section 3 the Legislature declared that the

"practices of discrimination against any of its inhabitants, because of race, creed, color, national origin or ancestry, are a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundations of a free democratic State."

Section 4 said that the opportunity to obtain employment without discrimination because of race, creed, color, national origin or ancestry "is recognized as and declared to be a civil right." Section 11 listed certain unlawful employment practices, among them refusal by an employer of employment to any individual because of race, creed, color, national origin or ancestry. Section 11(a), now, as amended, *N. J. S. A.* 18:25–12(a). And a Division Against Discrimination was created to administer, police and enforce the statute.

Obviously these two enactments born the same day were intended to stand side by side and be read together. Thus the

legislative intention was to prohibit, as to all persons, citizens or aliens, discrimination of the character described in private employment, *L*. 1945, *c*. 169, and specifically to prohibit such discrimination in employment on public works as to citizens of this State. *L*. 1933, *c*. 277, as amended, *L*. 1945, *c*. 171. These two enactments, in turn, must be considered as *in pari materia* with the New Jersey citizen preference statute relating to employment on public works projects. There is nothing in these later statutes which abrogates the aim of the 1931 and 1934 laws, *R. S.* 34:9–2, *supra, i. e.,* to give employment preference to New Jersey citizens, and if none are available, to permit employment of aliens.

The 1945 Law Against Discrimination was amended extensively, twice in 1962. Chapter 37 amended section 4 (among other sections) to provide:

"All persons shall have the opportunity to obtain employment, * * * without discrimination because of race, creed, color, national origin, ancestry or age, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right." *L*. 1962, *c*. 37, *N. J. S. A.* 18:25–4.

The act in its present form with its chapter 175 amendment makes it an unlawful employment practice or unlawful discrimination:

"a. For an employer, because of race, creed, color, national origin, ancestry or age of any individual * * *, to refuse to hire or employ * * * such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, * * *." *L*. 1962, *c*. 175, *N. J. S. A*. 18:25–12(a).

It is plain from a study of the enactments referred to above that the horizon of the Legislature in the area of civil rights has been an expanding one, characterized by a resolution to outlaw discrimination in the social and economic life of our State. The lawmakers' interest has not been limited to citizens. In recent years particularly, they have spoken in terms of "persons," who are defined no more restrictively than "one

or more individuals." *N. J. S. A.* 18:25–5(a). Moreover, we have seen promulgation of minimum wage laws, *N. J. S. A.* 34:11–34 to 56, laws against discrimination in wages, *N. J. S. A.* 34:11–56.1 to 56.11, and particularly statutes declaring the public policy of the State to be the establishment of a prevailing wage scale for workmen engaged in public works in order to protect them and their employers from the effects of unfair competition resulting from wage levels detrimental to efficiency and well-being. *N. J. S. A.* 34:11–56.25 to 56.46. And, of even more significance, public agencies of government have been given a mandate to ascertain the prevailing wage in the locality for each craft, trade or classification of all workmen needed to perform a contract for public work and to specify the wage in the contract. *N. J. S. A.* 34:11–56.28. All contracts made by the State, county or municipality for the performance of public work must provide that not less than the prevailing rate of daily wages shall be paid to mechanics, workmen and laborers by contractors or subcontractors. *R. S.* 34:10–1. In no one of these later statutes is any distinction made between citizens and aliens. Their mandates requiring payment of prevailing wages on public projects remove the 19th and early 20th century fear of importation of aliens to our shores as cheap labor. In view of all these manifestations of policy, it is difficult to avoid the conclusion that the Legislature now recognizes a right in the alien to work for a living in all the common occupations of the community, public and private.

But there is still another statute in this legislative plan which completes the panorama. As we have pointed out above, the 1933 act (*L.* 1933, *c.* 277) which appears in its amended form as *N. J. S. A.* 10:2–1, forbade discrimination against *any citizen* of the State of New Jersey in the hiring of laborers, workmen or mechanics on public projects. At the same 1962 session of the Legislature, when the Law Against Discrimination was liberalized further by chapters 37 and 175, *N. J. S. A.* 10:2–1 was amended to bring it into harmony with the latest expression of the legislative will. The

1962 amendment provides, among other things, that every contract for a public project between public bodies and the contractor shall contain an agreement that in the hiring of persons for the performance of the work no contractor or subcontractor shall "by reason of race, creed, color, national origin, or ancestry, discriminate against *any person* who is qualified and available to perform the work to which the employment relates; * * *" *L.* 1962, *c.* 213 (emphasis added). The elimination of "any citizen of the State of New Jersey" and the substitution of "any person" reveals the intention to prohibit discrimination of the nature described against aliens, as well as citizens, in the hiring of employees on such projects. This conclusion finds confirmation in the statement of purpose attached to the bill, *i. e.*, "This bill implements administration recommendations that legislation be enacted tightening New Jersey laws governing discrimination by persons contracting with public agencies."

This 1962 amendment, when considered alone or in conjunction with *R. S.* 34:9–2, *supra,* authorizing employment of aliens on public projects when no New Jersey citizens are available, demonstrates convincingly that it no longer can be considered unlawful for the State, county, or municipality or a contractor in the performance of public work to employ aliens as mechanics or laborers on the project. It follows, therefore, that the 1899 act, *R. S.* 34:9–1, which prohibits such employment is so inconsistent with the existing state of the law as to be no longer capable of continued existence.

Implied repealers are not favored in the law. But when a later expression of the legislative will is so clearly in conflict with an earlier statute relating to the same subject that the two cannot stand together reasonably, the courts have no hesitancy in finding a legislative intention to supersede the earlier law. *Two Guys From Harrison, Inc. v. Furman,* 32 *N. J.* 199, 223 (1960). In our opinion that is the situation in the case at bar, and *L.* 1899, *c.* 202, *R. S.* 34:9–1 can no longer be considered viable. The question whether the

1962 amendment, *L.* 1962, *c.* 213, operates also as an implied repealer of *R. S.* 34:9-2 which discriminates in favor of New Jersey citizens by giving them an employment preference on public projects is expressly reserved.

Since the complaint against the defendant was predicated on the 1899 statute, the conviction cannot be sustained. Accordingly, the judgment is reversed, and the matter is remanded for entry of judgment for the defendant.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For affirmance*—None.