Elsie Mary Jane LEGER, Beryl Jervis, on behalf of themselves and all others similarly situated

v.

William P. SAILER, individually and as the Executive Director of the Philadelphia County Board of Assistance.

Stanley A. MILLER, individually and as Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania.

Civ. A. No. 69–2869.

United States District Court,
E. D. Pennsylvania.

July 13, 1970.

Probable Jurisdiction Noted
Dec. 14, 1970.

See 91 S.Ct. 355.

Jonathan M. Stein, Douglas G. Dye, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Deputy Atty. Gen. Joseph P. Work, Harrisburg, Pa., for defendants.

Before ADAMS, Circuit Judge, and KRAFT and WOOD, District Judges.

OPINION AND ORDER

ADAMS, Circuit Judge.

The issue in this case is whether Pennsylvania's general assistance program runs afoul of the United States Constitution because it provides welfare aid to United States citizens residing within the Commonwealth, but denies such aid to persons residing in the Commonwealth who are not United States citizens.

The suit comes before us in the form of a class action. The plaintiffs, representing aliens who meet all other eligibility requirements for general assistance, allege that the Pennsylvania statute denies aliens the equal protection of the laws guaranteed by the Fourteenth Amendment, abridges aliens' freedom of interstate travel, and violates the Supremacy Clause of the Federal Constitution since it clashes with the federal power to regulate immigration and naturalization.

Because plaintiffs sought to enjoin a state statute on constitutional grounds which are not insubstantial, a three-judge court was convened pursuant to 28 U.S.C. §§ 2281, 2284.[1]

There are two major public assistance programs in Pennsylvania. The larger one is referred to as categorical assistance. Slightly more than one half of the funds for this program, which had its genesis in the Social Security Act of 1935, are provided by the Federal Government. The federally supported arrangement includes programs for aid to the blind, aid to the aged, aid to the permanently and totally disabled, and aid to families with dependent children. In Pennsylvania, aliens are eligible for categorical assistance. The other welfare program in Pennsylvania is general assistance. Section 432(2), Pennsylvania Public Welfare Code, 62 P.S. § 432(2).[2] This program provides aid for the needy who do not qualify for grants under the categorical assistance provisions. Because of the citizenship requirement in the general assistance statute, residents of Pennsylvania who are not citizens and who have economic need but do not fit into any of the four federal categories cannot obtain state aid.

 The sole reason given for excluding aliens from the general assistance legislation is that such a policy saves money or preserves the Commonwealth's financial resources for citizens. We consider this an inappropriate basis to support such a discrimination under the Equal Protection clause.

The applicable provisions of the Fourteenth Amendment extend protection to "all persons," and therefore include aliens. As early as 1886 the Supreme Court held that the Equal Protection and the Due Process Clauses are "universal in their application to all persons within the territorial jurisdiction without regard to any differences of race, color or of nationality." Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). *See also* Takahashi v. Fish & Game Comm., 334 U.S. 410, 420, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). *Cf.* Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 309, 90

---

1. The jurisdiction of the Federal Court is invoked under 28 U.S.C. § 1343(3) and (4), 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202, this being an action for declaratory judgment and preliminary and permanent injunctions to redress the deprivation under color of state law of rights, privileges and immunities secured to plaintiffs by the Constitution and laws of the United States.

2. "Section 432. Eligibility.
Except as hereinafter otherwise provided, and subject to the rules, regulations, and standards established by the department, both as to eligibility for assistance and as to its nature and extent, needy persons of the classes defined in clauses (1) and (2) of this section shall be eligible for assistance:
(1) Persons for whose assistance Federal financial participation is available to the Commonwealth * * *.
(2) Other persons who are citizens of the United States, or who, during the period January 1, 1938 to December 31, 1939, filed their declaration of intention to become citizens."

S.Ct. 1731, 26 L.Ed.2d 252. Although the Fourteenth Amendment does not prohibit all classifications in state laws, it requires that such classification between groups of persons have a legitimate state objective, and that the distinction drawn have a rational basis to effectuate that purpose. *Eg.* McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). *See* Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1082–1087 (1969). The policy of upholding a discriminatory state law provided there is some reasonable basis to do so applies to welfare legislation as well as other state economic or social regulations. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). When, however, state legislation in any field—social, economic or political—evidences an intent to discriminate on a basis of race, color, or nationality, the state bears a very heavy burden to justify it.[3] Discrimination on the basis of alienage, even though not a discrimination against a particular nationality, affects a "disadvantaged minority" and is therefore subject to strict judicial scrutiny. Takahashi v. Fish & Game Comm., 334 U.S. at 420, 68 S.Ct. 1138.

In *Takahashi,* the Supreme Court specifically compared discrimination based on alienage with discrimination based on color. The Court said that "the Fourteenth Amendment * * * protect[s] 'all persons' against state legislation bearing unequally upon them either because of alienage or color," and that "the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits." 334 U.S. at 420,[4] 68 S.Ct. at 1143.

In Hobson v. Hansen, Judge Wright explained that "[T]he Supreme Court has been vigilant in erecting a firm justification principle against every legal rule which isolates for differential treatment a disadvantaged minority, whether defined by alienage, * * * nationality * * *; or race * * *." 269 F. Supp. 401, 506–507 (D.D.C.1967) aff'd sub nom. Smuck v. Hobson, 132 U.S. App.D.C. 372, 408 F.2d 175, 176 (1969).[5]

The reason advanced for the citizenship requirement—saving or preserving public funds—is not compelling when we consider the severity of the deprivation imposed upon the excluded group. Those excluded are deprived of the "means to subsist—food, shelter, and other necessities of life". Shapiro v. Thompson, 394 U.S. 618, at 627, 89 S.Ct. 1322, at 1327, 22 L.Ed.2d 600 (1969). Though a state is not obligated to grant public assistance, the Supreme Court in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), clearly recognized the significance of such aid when it said: "Public assistance is * * * not mere charity, but a means to 'promote the general Welfare and secure the Blessings of Liberty to ourselves and our Posterity'." 397 U.S. at 265, 90 S.Ct. at 1019.

---

3. *See e. g.* Dandridge v. Williams, 397 U.S. at 485 n. 17, 90 S.Ct. 1153; Loving v. Va., 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); McLaughlin v. Fla., 379 U.S. 184, 191–192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

4. In *Takahashi* the Supreme Court also stated (334 U.S. at 419–420, 68 S.Ct. at 1143) that aliens are protected by 42 U.S.C. § 1981 (formerly Section 41 of the Nationality Act, 8 U.S.C. § 41) which provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other".

5. *Takahashi* has been cited a number of times to illustrate a classification which is "inherently suspect". *See* Kramer v. Union Free School District, 395 U.S. 621, 628 n. 9, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Harper v. Virginia State Board of Elections, 383 U.S. 663, 682 n. 3, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 295 n. 7, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964).

In Shapiro v. Thompson, 394 U.S. at 627, 89 S.Ct. 1322, the Supreme Court held that the interest of economy was an insufficient foundation to justify the denial of welfare benefits to persons who resided within the state for less than one year. In holding the state residency requirements for welfare eligibility unconstitutional, the Court said that it agreed with the contention that "the statutory prohibition of benefits to residents of less than a year creates a classification which constitutes an invidious discrimination denying them the equal protection of the laws". 394 U.S. at 627, 89 S.Ct. at 1327. Mr. Justice Brennan, speaking for the Court, made it abundantly clear that a discrimination which denied welfare benefits to a particular group could not be sustained on the ground that such denial saves government funds:[6]

> "We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot justify an otherwise invidious classification." 394 U.S. at 633, 89 S.Ct. at 1330.

In Goldberg v. Kelly, the Supreme Court repeated the proposition that "these governmental interests [of reducing administrative expenses and preventing the disbursement of funds it could not recover] are not overriding in the welfare context". In Goldberg, the Court held that such reasons did not justify the failure to provide a hearing to welfare recipients before aid is terminated. 397 U.S. at 266, 90 S.Ct. at 1019.

Dandridge v. Williams, one of the most recent Supreme Court cases in the welfare area, does not support the Pennsylvania legislation. Dandridge upheld a state regulation which set a maximum ceiling on the amount of aid for each family regardless of the number of children above a given figure. Although the plaintiffs claimed this created two classes—those with large families and those with small families—the Supreme Court found that the state had valid reasons, namely, to encourage employment and to avoid discrimination between welfare families and the families of the working poor, which provided a "solid foundation for the regulation". 397 U.S. at 486, 90 S.Ct. 1153. Dandridge is distinguishable from the present case on two additional grounds: first, the classification between large and small families is not inherently suspect as is one based on alienage; second the state did not completely exclude a particular group from all benefits—it merely limited the amount of payment per family.

The justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens. Aliens like citizens pay taxes and may be called into the armed forces. Unlike the short-term residents in Shapiro, aliens may live within a state for many years, work in the state and contribute to the economic growth of the state. This is illustrated by the stipulated facts in the present case. One of the named plaintiffs here worked in Pennsylvania for four years, until illness forced her to terminate employment.

Pennsylvania's efforts to justify the exclusion here are further weakened when the treatment of aliens in its entire public welfare program is carefully analyzed.

Although the federal statute does not require states to grant assistance to

---

6. Financial expense has been held an inadequate reason to justify discrimination in the criminal law. *See* Rinaldi v. Yeager, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

aliens,[7] Pennsylvania permits aliens to participate in its various categorical assistance programs. 62 P.S. § 432(1). The categorical programs are substantially larger than the general assistance program. Indeed, figures from the Commonwealth show that approximately 585,000 persons are on categorical assistance and 85,000 on general assistance.[8] Furthermore, in this case, there was evidence that non-citizen applicants for general assistance are less than 100 per year.[9] Accordingly, it is difficult to lend credence to the rationale that aliens are denied access to the general assistance program in order to conserve funds.

Pennsylvania attempts to rationalize its discrimination against aliens and contends it is not violating the Fourteenth Amendment because the state has an unqualified right to preserve public money or property for its own citizens. It draws this rule principally from People v. Crane, 214 N.Y. 154, 108 N.E. 427 (1915), aff'd sub nom. Crane v. New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218 (1915).[10] Crane, decided fifty-five years ago, upheld a New York statute which prohibited aliens from working on construction projects paid for with government funds. The validity of this discriminatory legislation today is exceedingly doubtful when the principles enunciated in Takahashi are considered.

In Takahashi, the Supreme Court refused to uphold a California law which denied commercial fishing licenses to aliens although the Court assumed that the provision was passed "to conserve fish in the California coastal waters or to protect California citizens engaged in commercial fishing from competition by Japanese aliens or for both reasons". 334 U.S. at 418, 68 S.Ct. at 1142. In that decision, the Court held that the state power to apply its laws exclusively to aliens as a class is confined within narrow limits, and thus reduced the range of legislative purposes which can justify "[s]tate laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States". 334 U.S. at 419, 68 S.Ct. at 1142.

Justice Cardozo's rationale for the decision in Crane was in large measure grounded on the theory that public employment is a privilege rather than a right. He said: "The state, in determining what use shall be made of its own moneys, may legitimately consult the welfare of its own citizens, rather than that of aliens. Whatever is a privilege, rather than a right, may be made

---

7. In Richardson v. Graham, 313 F.Supp. 34, a three-judge-court held that a 15 year residency requirement in Arizona for aliens requesting public welfare under Arizona's federally supported programs violated the Equal Protection Clause of the Fourteenth Amendment. (D.Ariz., filed May 27, 1970).

8. Department of Public Welfare Report of Public Assistance, Dec. 31, 1969.

9. Although the Pennsylvania statute does not involve the federal social security program, the defendants say that Congress authorized discimination against aliens in the federal statute when it stated:

"The Secretary * * * shall not approve any plan which imposes, as a condition of eligibility for aid * * *
* * * * *
"(2) Any citizenship requirement which excludes any citizen of the United States." 42 U.S.C. § 1202(b) (2) (1964).

See also 42 U.S.C. § 1352(b) (2) (disabled); 1382(b) (3) (aged, blind or disabled); § 302(b) (3) (aged).
A similar provision in the federal statute regarding residency was not considered congressional authority to allow one year residency requirements. Shapiro v. Thompson, 394 U.S. at 638–641, 89 S.Ct. 1322, 22 L.Ed.2d 600. The Court in Richardson v. Graham, supra note 7, also rejected an argument which was similar to that made by the Commonwealth.
In the Civil Rights Act of 1964 Congress prohibited discrimination because of national origin in any program receiving federal assistance. 42 U.S.C. § 2000d.

10. Crane was affirmed on the basis of Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206 (1915) which in turn relied on Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148 (1903). But see Powell, The Right to Work for the State, 16 Col.L.Rev. 99, 111 (1916).

dependent upon citizenship." 108 N.E. at 430. The "privilege-right doctrine" no longer has vitality as a justification for the deprivation of a constitutional right. The Supreme Court has only recently stated, "the constitutional challenge cannot be answered by the argument that public assistance benefits are a 'privilege' and not a 'right'." Shapiro v. Thompson, 394 U.S. at 627 n. 6, 89 S. Ct. at 1327; Goldberg v. Kelly, 397 U.S. at 262, 90 S.Ct. at 1017 and cases cited therein. *See also* Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 82 Harv.L.Rev. 1439 (1968).

The *Crane* decision, which has not been relied on to uphold anti-alien legislation since it was decided, was rejected as controlling by the California Supreme Court sitting *en banc* last year. In Purdy & Fitzpatrick v. California, 71 A.C. 587, 79 Cal.Rptr. 77, 456 P.2d 645 (1969), the California Court held that a section of the Labor Code which prohibited employment of aliens on public works was unconstitutional. That Court could find no " 'special public interest' to justify this discriminatory legislation which encroaches upon, the congressional scheme for immigation and naturalization, and violates the equal protection clause of the Fourteenth Amendment. 456 P.2d at 650, 653. It rejected the theory of an absolute proprietary interest in the disbursement of public funds on the basis of the standard and holding of *Takahashi*.[11]

Pennsylvania also relies on Patsone v. Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539 (1914), which allowed a

state to preserve game for its own citizens, and on a number of cases upholding restrictions on an alien's right to own property. Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923); Porterfield v. Webb, 263 U.S. 225, 44 S.Ct. 21, 68 L.Ed. 278 (1923); Webb v. O'Brien, 263 U.S. 313, 44 S.Ct. 112, 68 L.Ed. 318 (1923); Frick v. Webb, 263 U.S. 326, 44 S.Ct. 115, 68 L.Ed. 323 (1923). The land cases, questioned by the Supreme Court in *Takahashi* and Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948),[12] are insufficient authority to uphold discriminatory welfare legislation, just as they were insufficient authority to uphold discriminatory employment legislation in *Takahashi* and *Purdy & Fitzpatrick.*

Although there may be an area in which the state may permissibly preserve natural resources for its own citizens by discriminating against aliens, just as it may in such respects discriminate against residents of other states, a discrimination against resident aliens which, as the parties in this case stipulated, "causes undue hardship by depriving them of the means to secure the necessities of life, including food, clothing and shelter", and "discourages continued residence in Pennsylvania of indigent resident aliens and causes such needy persons to remove to other states which will meet their needs", is substantially different and invalid.

Pennsylvania has cited numerous state statutes which discriminate against aliens.[13] These statutes have not been subjected to judicial scrutiny, and we do

11. Ratti v. Hinsdale Raceway, Inc., 109 N.H. 270, 249 A.2d 859, (1969); Garden State Dairies of Vineland Inc. v. Silla, 46 N.J. 349, 217 A.2d 126 (1965); Department of Labor & Industry v. Cruz, 45 N.J. 372, 212 A.2d 545 (1965), *in dicta* all indicate doubt as to the validity of *Crane.*

12. In *Oyama* four justices said the restrictions were unconstitutional. *Takahashi* and *Oyama* were relied on by the highest Court of two states to invalidate portions of their state alien land laws. Fujii v. State, 38 Cal.2d 718, 242 P.2d

617 (1952). Namba v. McCourt, 185 Or. 579, 204 P.2d 569 (1949). *See* Comment, The Alien and the Constitution, 20 U. Chi.L.Rev. 547, 564–70 (1953). *See also* State v. Oakland, 287 P.2d 39, 42 (Montana, 1955).

13. *But see* Limestone Company, Ltd. v. Fagley, 187 Pa. 193, 40 A. 977 (1898), where the Pennsylvania Supreme Court invalidated a discriminatory tax on alien employees as violative of the Equal Protection Clause of the Fourteenth Amendment.

not decide the validity or invalidity of any of them at this time. We note, however, that the validity of restrictions on an alien's right to work have been seriously questioned on the basis of *Takahashi. See* Constitutionality of Restrictions on Aliens' Right to Work, 57 Col. L.Rev. 1012 (1957);[14] Note, 1947–48 Term of the Supreme Court: The Alien's Right to Work, 49 Col.L.Rev. 257 (1949).

We hold that the provision in the general assistance law prohibiting its applicability to residents of Pennsylvania who are not citizens is invalid as violating the Equal Protection clause of the United States Constitution. In view of this decision we consider it unnecessary to pass upon plaintiffs' other contentions that the Pennsylvania statute violates the Supremacy Clause of the Constitution and interferes with the aliens' right to interstate travel.

The above constitutes the findings of fact and conclusions of law required by Rule 52(a). Accordingly, the motion for preliminary and permanent injunction will be granted.

WOOD, District Judge (dissenting).

I must respectfully dissent.

This is a class action brought on behalf of resident aliens to challenge the constitutionality of Section 432(2) of The Pennsylvania Welfare Code, 62 P.S. § 432(2) insofar as it denies general public assistance to persons otherwise qualified to receive it solely on the ground that they are not citizens of the United States.[1] The defendants, who are the state officials charged with administration of the statutory provision which is challenged, concede that the named plaintiffs would qualify for general assistance except for the fact of their alienage, but they maintain that neither federal law nor the constitution precludes the state from denying to aliens that assistance which it dispenses to citizens solely from its own resources.

Plaintiffs first contend that Pennsylvania's citizenship requirement is invalid because it places an undue burden on their right to interstate travel. They place great reliance on Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed. 2d 600 (1969) in which the Supreme Court invalidated Pennsylvania's one-year residence requirement for welfare recipients because it "touche[d] on the fundamental right of interstate movement" of citizens and was not justified by any "compelling state interest." However even assuming *in arguendo* that aliens have the same right in all respects to travel freely between states as do citizens,[2] I do not think that the statutory

14. For a list of law review material discussing the unconstitutionality of the aliens right to work *see* 57 Col.L.Rev. 1013 n. 4.

1. Since the funds for the general assistance program here challenged are provided entirely by the state and municipalities therein and the program is not supported by federal grants, there is no question presented here of whether the state provisions are in conflict with the Federal Social Security Act or regulations thereunder.

2. The right to travel between states is not specifically enumerated in the Constitution, but Courts have inferred such a right from several of it provisions. However, when such a right has been mentioned, the Court has referred to it as a right belonging to "citizens". See Shapiro v. Thompson, 394 U.S. 618, 629, 633, 89 S.Ct. 1322, 22 L.Ed.2d 600, " * * * the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement."; Edwards v. California, 314 U.S. 160, 181, 62 S.Ct. 164, 170, 86 L.Ed. 119 (1941) ("The conclusion that the right of free movement is a right of National Citizenship stands on firm ground." Passenger Cases, 7 How. 283, 492, 12 L.Ed. 702 (1849); Kent v. Dulles, 357 U.S. 116, 125, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); Ward v. Maryland, 12 Wall. 418, 430, 20 L.Ed. 449 (1871). On the other hand, in Truax v. Raich, 239 U.S. 33, 42, 36 S.Ct. 7, 60 L.Ed. 131 (1915) and other cases, the Court has held that aliens lawfully admitted to the country under the authority of acts of Congress have the right to "enter and abide" in the various

classification in this case "touches on the fundamental right of interstate movement"[3] in the same respect as the classification proscribed by the Court in *Shapiro* and that the Court in *Shapiro* did not intend its holding to encompass state statutes such as the one before us. In *Shapiro*, it was undisputed and the Court found that the Pennsylvania statute created two classes, the only difference between them being that members of one had been residents of Pennsylvania for a year and members of the other had not, and proceeded to favor the former class on that ground alone. Here, on the other hand, the distinction drawn by the statute in question is between aliens and citizens of the United States. Whether an alien is a long-time resident of Pennsylvania or is newly-arrived from another state is irrelevant; plaintiffs are denied welfare by Pennsylvania not because they have traveled to Pennsylvania from another state, but rather because they are aliens.

To extend *Shapiro* by holding that the state statutory classification in this case touches on the "fundamental right of interstate movement" and must be abandoned absent a "compelling" state interest would be to put in jeopardy all state laws which treat a certain group of people less generously than that group is treated by another state, and which therefore might disincline persons of lesser means from travelling into that state. Such a holding would virtually require states to provide indigents moving inside its borders with enough money to stay. I am unable to go so far. Since I would not find that Pennsylvania's classification here touches on the right of interstate movement enunciated in *Shapiro*, I would not reach the question of whether Pennsylvania has demonstrated a "compelling" interest in the classification.

Plaintiffs secondly contend that Pennsylvania's citizenship requirement is invidious and offensive to the equal protection clause. Both parties agree that, as a general proposition, the word "person" in the Fourteenth Amendment includes resident aliens, and that therefore aliens are entitled to the same substantive and procedural benefits of the Amendment as citizens. Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Further, the plaintiffs concede that in a number of cases in the wake of *Yick Wo* the Court carved out a number of exceptions to the foregoing general proposition, one among them being that the "moneys of the state belong to the people of the state" and "do not belong to aliens" and therefore the state may favor its citizens to aliens in the distribution of the common property or resources of the people of the state. McCready v. Virginia, 94 U.S. 391, 24 L.Ed. 248 (1877). As Justice Cardozo, at the time a member of the New York Court of Appeals, stated in a case involving state preference of citizens over aliens in public works contracts:

"Every citizen has a like interest in the application of the public wealth to the common good and the right to demand that there be nothing of partiality, nothing of merely selfish favoritism in the administration of the trust. But an alien has no such interest; and hence results a difference in the measure of his right. To disqualify citizens from employment on the public works is not only discrimination but arbitrary discrimination. To disqualify aliens is discrimination indeed, but not arbitrary discrimination, for the principle of exclusion is the restriction of the resources of the state to the advancement and profit of the members of the state. Ungenerous and unwise, such discrimination may

---

states. The Court indicated that the alien's right to "enter and abide" stemmed from federal law and not from the Fourteenth Amendment and could therefore be retracted by federal statute. Therefore, it is doubtful that this right to enter

and abide of aliens is the same in all respects as the right of citizens to travel between states.

3. 394 U.S. at 638, 89 S.Ct. at 1333.

be. It is not for that reason unlawful." People v. Crane, 108 N.E. 429 (1915).

The decision of the New York Court was thereafter unanimously affirmed by the Supreme Court in an opinion which summarily dismissed as "without foundation" the plaintiffs' claim that the state's preference of citizens over aliens in public works violated the equal protection clause. Crane v. New York, 239 U.S. 195, 199, 36 S.Ct. 85, 60 L.Ed. 218 (1915). See also Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206 (1915).[4]

The plaintiffs contend, however, that these early precedents have in effect been overruled *sub silentio* by other decisions. I disagree because I think to the contrary that subsequent decisions have either affirmed or left untouched the Crane doctrine. In Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915), cited by the plaintiffs, the Court held that a state statute providing for discrimination against aliens in matters relating to "ordinary private enterprise" violates the right of aliens to "enter and abide" in that state unless there is a "special state interest" involved and invalidated an Arizona law requiring all private commercial business to have work forces composed of at least 80 per cent United States citizens. The Court found in that case that there was

no "special state interest" in such an all encompassing regulation of "all ordinary private enterprise".[5] In its decision, which was handed down the same year as *Crane*, the Court said nothing to diminish the effect of the *McCready-Crane* doctrine and in fact specifically cited *McCready* and some of its progeny with approval. See 239 U.S. at p. 40, 36 S.Ct. 7.

More recently, in Takahashi v. Fish and Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), also relied upon by the plaintiff, the Court cited with approval the standards enunciated in *Truax* and invalidated a California law forbidding Japanese aliens from commercial fishing off the California coast on the ground that the state had not demonstrated a "special public interest" in regulating Takahashi's commercial fishing. It is true that in *Takahashi* the Court recognized the technical possibility that California might in some sense "own" those fish which ventured inside the three-mile ocean limit,[6] but the Court treated the California law as a regulation of aliens in private enterprise under the *Truax* test and left untouched the *McCready-Crane* doctrine.

I have not found, nor do I find in Shapiro v. Thompson,[7] supra, or Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970),[8] cited by the plaintiffs (neither of which relates to

---

4. In which a unanimous court upheld against attack on Fourteenth Amendment grounds a New York statute, Laws 1909, c. 36, which provided that "In the construction of public works by the state or a municipality, only citizens of the United States shall be employed; and in all cases where laborers are employed on any such public works preference shall be given citizens of the State of New York."

5. The Court stated at 239 U.S. 43, 36 S.Ct. 11 that "no special public interest with respect to any particular business is shown that could possibly support the enactment, for as we have said it relates to every sort."

6. The law in question barred all aliens residing in California from commercial

fishing off the California coast, whether within or without the three-mile limit.

7. *Shapiro* was decided on the ground of interference with the right of interstate movement and has already been discussed on that ground. We note in passing that contrary to the plaintiffs' assertions, the "compelling state interest" required to justify state legislation relating to interstate movement in *Shapiro* does not apply to cases involving welfare legislation. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

8. In *Goldberg*, the Court held that whether welfare was considered as a privilege or a right, it could not be terminated without a fair hearing. However, subsequently in Dandridge v. Williams, *supra*, the Court intimated that the holding in *Goldberg*

aliens) any indication that the Court has overruled the doctrine of *Crane* and *Truax*[9] that while the state, absent a special state interest, is not permitted to intrude upon an alien's right to "enter and abide" by statutes which discriminate against them as opposed to citizens in the conduct of ordinary private enterprise, the state as proprietor of the resources of the citizens of the state may favor its own citizens in the disbursement of those resources.[10] Being mindful of the recent admonition of the Supreme Court that the *"Fourteenth Amendment gives the federal courts no power to impose on the states their views of wise economic or social policy"*[11] I would not overturn what I consider to be a settled precedent.

Plaintiffs' final contention is that Pennsylvania's general assistance citizenship requirement conflicts with federal laws relating to the admission and naturalization of aliens and is therefore preempted pursuant to the supremacy clause. We are specifically directed to several provisions of federal law relating to the admission of indigents to this country: Title 8 U.S.C. § 1182(a) (7, 8, and 15) provide *inter alia* that the following classes of aliens shall be excluded from admission: "paupers", "aliens * * who are likely at any time to become public charges", and "aliens * * * who are certified * * * as having a physical defect, disease, or disability * * * of such a nature that it may affect the ability of the alien to earn a living. * * * " Section 1251 allows the Attorney General under certain circumstances to deport an alien who has become a public charge. Section 1183 provides that an alien excludable because he is likely to become a public charge may be admitted at the discretion of the Attorney General after posting a bond.

I take the standard for determining whether a state law relating to aliens is preempted by federal law from Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). In that case, where the Court invalidated a Pennsylvania alien registration law because it overlapped federal law, Justice Black stated *inter alia* that:

"* * * where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the

---

was not intended to affect state determination of welfare eligibility:

"The constitution may impose certain procedural safeguards upon systems of welfare administration. * * * (citing Goldberg) *But the constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.*" (Emphasis mine) 397 U.S. 471, 487, 90 S.Ct. 1153, 1163, 25 L.Ed.2d 491 (1970).

9. I do not see anything in *Takahashi, supra,* 334 U.S. at p. 420, 68 S.Ct. 1138, to the effect that because state legislation relating to aliens affects a "disadvantaged minority" it is therefore subject to "strict judicial scrutiny" apart from the ordinary "rational basis" test ordinarily applied to state welfare legislation. *Cf.* Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). At that point in *Takahasi, supra,* the Court in effect points out that in view of the general rule enunciated in Yick Wo v. Hop-

kins, *supra.,* the superseding effect of federal laws regulating aliens, Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), and 8 U.S.C. § 41, the power of the states to pass laws relating to aliens is limited. Both parties here concede this. Moreover, the Court in *Takahashi, supra.,* was making the point, with which all are in agreement, that pursuant to its powers to regulate aliens, Congress can make certain distinctions which the states cannot. Accordingly, the compelling state interest required to justify state legislation inhibiting an alien's right to travel, *Cf.* Shapiro v. Thompson, *supra,* or to legislation affecting a "disadvantaged minority" would be inapplicable here.

10. This distinction was cited with approval by the Supreme Court as recently as 1960 in Cafeteria and Restaurant Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

11. (Emphasis mine) Dandridge v. Williams, *supra,* 397 U.S. at p. 486, 90 S.Ct. at p. 1163 (1970).

registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." 312 U.S. 66–67, 61 S.Ct. 403. It was further stated that any concurrent power in such a field must be "restricted to the narrowest of limits", 312 U.S. at 68, 61 S.Ct. at 404, but that "in the final analysis, there can be no one crystal clear distinctly marked formula" for determining whether the state law is inconsistent with federal law:

"Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress". 312 U.S. at 67, 61 S.Ct. at 404.

In the light of these standards I cannot conclude that Pennsylvania's citizenship requirement is preempted by federal law. *Hines* and the other cases relied upon by the plaintiffs were concerned with requirements under state law which would hinder, obstruct, or harass aliens in such a way as to interfere with the federal scheme of regulation. Pennsylvania's citizenship requirement does not regulate the conduct of aliens, but rather excludes them from an affirmative benefit which the state may or may not decide to dispense to its own citizens. If the state had no welfare program at all, federal laws relating to aliens would not be obstructed; it is difficult to see how federal laws are obstructed any more because the state decides to give welfare payments to citizens.

By the same token, I am unable to conclude that the specific statutory provisions cited previously and relied on by the plaintiffs evidence any Congressional intent to require the states to include (or, for that matter, not to include) aliens as beneficiaries of their welfare programs. To the contrary, the federal laws cited previously leave the impression that Congress wanted to relieve the states (and the federal government) of the burden of aliens who were, or might become, public charges. I cannot infer from such an intent to relieve the states of such a burden, a corresponding intent to require the states to pay welfare to aliens.

Accordingly, I respectfully dissent.